IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. |
| EL PASO NATURAL GAS COMPANY, | ) | CONSENT DECREE |
| Defendant. | ) | |

TABLE OF CONTENTS

I. JURISDICTION AND VENUE .................................. 7

II. APPLICABILITY ........................................... 8

III. OBJECTIVES ............................................. 10

IV. DEFINITIONS ............................................. 11

V. CIVIL PENALTY ............................................ 15

VI. GENERAL COMPLIANCE REQUIREMENTS ......................... 16

VII. MODIFICATIONS TO PIPELINE SYSTEM ....................... 17

VIII. GAS QUALITY MONITORING ................................ 19

IX. CHEMICAL ANALYSIS OF SAMPLES ............................ 20

X. MODIFICATION TO SITE SPECIFIC PLANS ...................... 22

XI. NON-DESTRUCTIVE TESTING and/or OTHER INSPECTIONS ...... 24

XII. TRAINING REGARDING INTERNAL CORROSION .................. 31

XIII. REVISIONS TO DEFENDANT'S OPERATION AND MAINTENANCE MANUAL ................................. 33

XIV. APPROVAL OF DELIVERABLES . . . . . . . . . . . . . . . . 33

XV. REPORTING REQUIREMENTS ................................. 36

XVI. STIPULATED PENALTIES .................................. 40

XVII. FORCE MAJEURE ......................................... 46

XVIII. DISPUTE RESOLUTION ................................... 48

XIX. INFORMATION COLLECTION AND RETENTION ...................51

XX. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ............. 55

XXI. COSTS ........................................ 57

XXII. NOTICES ........................................ 58

XXIII. EFFECTIVE DATE ........................................ 59

XXIV. RETENTION OF JURISDICTION ........................................ 59

XXV. MODIFICATION ........................................ 60

XXVI. TERMINATION ........................................ 61

XXVII. PUBLIC PARTICIPATION ........................................ 63

XXVIII. SIGNATORIES/SERVICES ........................................ 64

XXIX. INTEGRATION ........................................ 64

XXX. FINAL JUDGMENT ........................................ 65

XXXI. EMERGENCY ACTIONS ........................................ 65

XXXII. APPENDICES ........................................ 66

WHEREAS, on August 19, 2000, a natural gas transmission pipeline owned and operated by El Paso Natural Gas Company ("EPNG"), ruptured. The Pipeline, line 1103, released natural gas which ignited, causing an explosion tragically killing twelve members of an extended family camping under a bridge that supported the pipeline across the Pecos River;

WHEREAS, it was determined that the cause of the rupture was severe internal corrosion at various locations in pipeline 1103, corroding the pipe wall sufficiently to make it susceptible to rupture under the pressures at which gas is transported in the pipeline, without being detected by EPNG's processes and procedures in place prior to the rupture; WHEREAS, an investigation of the rupture was conducted by the National Transportation Safety Board ("NTSB") and a report issued by the NTSB concluded that low spots and inefficient underground equipment known as "drip traps" contributed, in part, to the circumstances in which internal corrosion could occur;

WHEREAS, on August 23, 2000 the Research and Special Programs Administration ("RSPA" and predecessor to the Pipeline and Hazardous Material Safety Administration referred to herein as "PHMSA") of the Department of Transportation("DOT") issued a Corrective Action Order ("CAO") to EPNG requiring immediate

actions on its pipelines in the vicinity of the Pecos River in New Mexico. The CAO listed twenty-four (24) required corrective action items requiring EPNG to among other things, keep pipeline 1103 out of service until additional information about the pipeline was known, and use x-ray and ultrasonic equipment techniques to assess the integrity of certain sections of pipeline that may have periods of no flow or where liquids may accumulate and hydro-statically test these lines. The CAO also required EPNG to develop a plan to assess the integrity of the remainder of the El Paso Pipeline System, and develop a risk based plan to inspect, assess and correct, as necessary, those areas for signs of internal corrosion or other metal loss. EPNG complied with the required items listed in the CAO;

WHEREAS, after the rupture, EPNG and its parent, El Paso Corporation, committed to develop and implement a program of best practices concerning the prevention and detection of internal corrosion within high-pressure, interstate natural gas transmission pipelines;

WHEREAS, as part of such revised practices to assist in preventing and detecting internal corrosion, EPNG committed through resolution from the Board of Directors of its parent company, to "Make Piggable" (as defined herein) certain pipeline

segments of its Natural Gas Pipeline system by the end of 2012, and to conduct such in-line inspections, and re-inspections, of its facilities to ensure their integrity, estimated as of June 30, 2007 to cost over $300 million to complete;

WHEREAS, prior to the rupture, EPNG had used in-line inspection tools to inspect only 6% of its system but since the rupture through June 30, 2007, EPNG has completed its Make Piggable work on approximately 78% of its system and has conducted in-line inspections on 67% of its system which is part of the Make Piggable work;

WHEREAS, after the rupture, EPNG inspected 259 low spots on its interstate natural gas transmission in response to the CAO, and subsequently developed and continues to use Site Specific Plans (defined herein) to address potential liquid traps, which may include low spots, within its system,

WHEREAS, after the rupture, EPNG began investigating whether its drip traps were acting effectively, and has since removed, or scheduled to remove, all of the traps found to be ineffective;

WHEREAS, EPNG's Corrosion Control Program has also been revised to incorporate risk prioritization, expanded sampling and testing of liquids, leak surveys, in-line inspection ("ILI") re-inspections, and Site Specific Plans which involve comprehensive

annual reviews of EPNG's facilities and development and implementation of remedial actions plans;

WHEREAS, EPNG has increased its focus on technical competency in internal corrosion, with over 450 EPNG and related technical support services employees receiving training on internal corrosion control;

WHEREAS, EPNG has increased its focus on gas quality by installing additional Customer Quality Assurance Valves and on-line monitoring and analysis equipment with telemetry for "real time" readings, creating Gas Quality Guidelines which formalizes the approach to gas quality, and developing a gas quality database which assists in identifying trends and analysis of gas quality patterns;

WHEREAS, in the Notice of Probable Violation ("NOPV"), Proposed Civil Penalty and Proposed Compliance Order (CPF No. 4-2001-1004) issued on June 20, 2001 by RSPA, RSPA alleged violations that it found played a critical role in the August 19, 2000 incident. These alleged violations concerned EPNG's training in internal corrosion, failure to follow procedures and communicate important operating information, and to consider how information on one pipeline segment could be relevant to other sections of the pipeline system. RSPA and the Defendant were

unable to resolve the NOPV, and the matter was referred to the Department of Justice by RSPA;

WHEREAS, the Parties entered settlement negotiations and during the course of those negotiations engaged the services of Dynamic Risk Assessment Systems, Inc. ("DRA") to assist the Parties in reviewing Defendant's gas quality monitoring and Corrosion Control Programs focusing on internal corrosion which had been substantially modified since the rupture. DRA and representatives of the United States met with personnel from Defendant's gas quality team and Corrosion Control Program, and reviewed, among other things, the following information: Defendant's Operation and Maintenance Manual; Defendant's Corrosion Control Manual; maps of the EPNG's pipeline system; Defendant's gas quality monitoring program; the Gas Quality Database and examples of historic data retrieved from this database; the Pipeline Operating Procedures Manual; examples of historic internal corrosion failure records and analysis; and Area Site Specific Plans including: examples of NDE inspection results; samples of ILI results; the schedule for maintenance pigging and ILI runs; the placement, type and evaluation methods of corrosion coupons; and examples of laboratory results from laboratory samples taken. After evaluating the above information

and having discussions with personnel from EPNG's Corrosion Control Program, DRA and technical personnel from the Pipeline and Hazardous Materials Safety Administration ("PHMSA") made recommendations concerning the operation of Defendant's Corrosion Control Program, the majority of which have been incorporated into Defendant's procedures and are requirements of this Consent Decree, and are reasonably likely to result in compliance with the applicable regulations concerning internal corrosion on Defendant's Natural Gas Pipeline System;

WHEREAS, DRA or another Approved Contractor, will continue to review and comment on Plans and findings submitted pursuant to obligations of this Consent Decree;

WHEREAS, Plaintiff United States of America, on behalf of the United States Department of Transportation ("DOT"), has filed a complaint in this action, concurrently with this Consent Decree, alleging that Defendant El Paso Natural Gas Company ("Defendant") violated Section 60101 et seq., and the applicable implementing regulations at 49 C.F.R. Part 192, et. seq., of the Federal Pipeline Safety Laws, 49 U.S.C. § *60101* *et seq*.;

WHEREAS, the Complaint against Defendant alleges that Defendant failed to employ personnel qualified in corrosion control methods as required by 49 C.F.R. § 192.453; Defendant was

transporting corrosive gas on its pipelines 1103 and 1107 and failed to investigate and mitigate internal corrosion in violation of 49 C.F.R. § 192.475; and Defendant failed to use coupons or other suitable means of monitoring its pipelines to determine the effectiveness of steps taken to minimize internal corrosion in violation of 49 C.F.R. § 192.477;

WHEREAS, Defendant does not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest; and

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, below, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, 1355

and 49 U.S.C. § 60120(a)(1) of the Pipeline Safety Laws, and over the Parties. Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in, and Defendant conducts business in, this judicial district. For purposes of this Decree, or any action to enforce this Decree, Defendant consents to the Court's jurisdiction over this Decree or such action and over Defendant and consents to venue in this judicial district.

2. For purposes of this Consent Decree, Defendant agrees that the Complaint states claims upon which relief may be granted pursuant to Sections 49 U.S.C. § 60120(a)(1), and 28 U.S.C. §§ 516 and 519.

## II. APPLICABILITY

3. The obligations of this Consent Decree apply to and are binding upon the United States, and upon Defendant and any successors, assigns, or other entities or persons otherwise bound by law.

4. No transfer of ownership or operation of Defendant's Natural Gas Pipeline System, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendant of its obligation to ensure that the terms of the Decree are implemented unless the portion of Defendant's Natural

Gas Pipeline System that is transferred or abandoned is no longer subject to the Federal Pipeline Safety Laws (defined herein). For all transfers of ownership of operation of Defendant's Natural Gas Pipeline System that remains subject to the Federal Pipeline Safety Laws, Defendant shall provide a copy of this Consent Decree, at least thirty (30) days prior to such transfer, to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to the Office of Pipeline Safety Southwest Region, the Deputy Chief Counsel in the Office of Chief Counsel of the Pipeline and Hazardous Material Safety Administration, the United States Attorney for the District of New Mexico, and the United States Department of Justice, in accordance with Section XIV of this Decree (Notices). Any attempt to transfer ownership or operation of the Defendant's Natural Gas Pipeline System without complying with this Paragraph constitutes a violation of this Decree.

5. Defendant shall provide a copy of this Consent Decree to all of Defendant's officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work to comply with the provisions set forth in

Sections VII through XIII. Defendant shall require conformity with the terms of this Consent Decree as a condition of the contract.

6. In any action to enforce this Consent Decree, Defendant shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III. OBJECTIVES

7. It is the express purpose of the Parties in entering into this Consent Decree to further the objectives of the Federal Pipeline Safety Laws, 49 U.S.C. § *60101* *et seq*. (defined herein), and its implementing regulations, to specifically require EPNG to, among other things, monitor and respond to potentially corrosive gas quality constituents present in its gas stream. It is also the express purpose of the Parties to ensure that Defendant investigates and mitigates internal corrosion in its Natural Gas Pipeline System, and monitors its pipelines to determine the effectiveness of steps taken to minimize internal corrosion.

## IV. DEFINITIONS

8. Terms used in this Consent decree that are defined in the Federal Pipeline Safety Laws or in regulations promulgated pursuant to the Federal Pipeline Safety Laws shall have the meanings assigned to them in the Federal Pipeline Safety Laws or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a. "Approved Contractor" shall mean a consultant selected by the Defendant and approved by DOT to review and comment on plans, reports or other items or deliverables required to be submitted under this Decree. The Approved Contractor must be qualified in the detection, prevention and mitigation of internal corrosion in natural gas pipelines. To the extent that Defendant selects DRA as its Approved Contractor, the United States has provided its approval. To the extent Defendant selects a different consultant to review and comment on plans, reports or other items or deliverable required to be submitted under this Decree, Defendant shall submit the name, address and description of its qualifications to DOT for DOT's approval.

b. "Complaint" shall mean the complaint filed by the United States in this action.

c. "Consent Decree" or "Decree" shall mean this Decree and all appendices attached hereto (listed in Section XXXII).

d. "Day" shall mean a calendar day unless expressly stated to be a working day. In computing any period of time under this

e. "Defendant" shall mean El Paso Natural Gas ("EPNG "), which is a corporation organized and existing under the laws of the State of Delaware. EPNG is a wholly-owned indirect subsidiary of El Paso Corporation.

f. "DOT" shall mean the United States Department of Transportation and includes the Pipeline and Hazardous Materials Safety Administration ("PHMSA").

g. "Dynamic Risk Assessment Systems, Inc." ("DRA") is a company based in Calgary, Alberta, Canada, and its core focus is the development of risk assessment models and all aspects of pipeline integrity management. The company has particular expertise in the areas of pipeline threat and reliability assessment, consequence modeling, and data management system.

h. "Federal Pipeline Safety Laws" shall mean the laws set forth in 49 U.S.C. Section 60101 et. seq., and the applicable implementing regulations at 49 C.F.R. Part 192, et. seq.

i. "Gas Quality Database" shall mean Defendant's database that collects data from numerous sources to provide compositional data, as well as calculating hydrocarbon dewpoint (cricondentherm) and water vapor dewpoints from the data provided. Data sources include field chromatographs via Supervisory Control and Data Acquisition (SCADA), online analyzers via both VISA and SCADA, and gas flow volumes, temperatures and pressures replicated from the database system currently known as Corporate Measurement System (CMS).

j. "Make Piggable" shall mean making modifications to accommodate an in-line inspection ("ILI") tool through those pipeline segments in Defendant's Natural Gas Pipeline System which are susceptible to ILI inspection as one means to identify the potential metal loss in the wall thickness of steel pipes as detected from the interior of the pipeline. Segments of Defendant's Natural Gas Pipeline System which are not susceptible to ILI inspection, and which shall not be modified to accommodate an ILI tool under this work, are those segments which

do not permit the successful passage of an ILI tool through their interior and include, for example, lines smaller than six inches in diameter, lines with insufficient line pressure and/or flow rates, pipes with combinations of small diameters or with certain fittings and bend-types associated with such small diameter pipes.

k. "Natural Gas Pipeline System" shall mean Defendant's interstate natural gas pipeline system as of the day of lodging that extends from delivery points in the San Juan, Permian, and Anadarko Basins to receipt points in California, Arizona, New Mexico, Oklahoma, and Texas, as well delivery points at the US/Mexico border. Defendant's Natural Gas Pipeline System consists of over 10,000 miles of pipeline, including looped lines.

l. "Operating Area" means that geographical area created by boundaries drawn by Defendant to reflect an operational commonality between the facilities located within that area. Each Operating Area is assigned an Area Manager, specific operations personnel, and related technical support personnel who together manage the operations, maintenance, and pipeline integrity requirements for the facilities located within the area. EPNG currently has fifteen (15) such operating areas

which are represented on the three maps attached as Appendix B to this Decree.

m. "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral.

n. "Parties" shall mean the United States and Defendant.

o. "Section" shall mean a portion of this Decree identified by a roman numeral.

p. "Site Specific Plans" shall mean the plans for each of the Operating Areas that EPNG owns and operates. These Site Specific Plans contain the internal corrosion control monitoring, testing, and inspection requirements for each of EPNG's Operating Areas. The Site Specific Plans have been developed and are updated based on operating area-specific and site-specific factors. EPNG personnel document tasks related to each Operating Area in the Site Specific Plans.

q. "United States" shall mean the United States of America, acting on behalf of DOT.

V. CIVIL PENALTY

9. Within thirty (30) days after the Effective Date of this Consent Decree, Defendant shall pay the sum of $15,500,000.00 as a civil penalty. The $15,500,000.00 civil

penalty shall be paid together with any interest accruing from the date on which this Consent Decree is lodged or July 31, 2007 whichever date is earlier, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging. Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with instructions to be provided to Defendant, following lodging of the Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the District of New Mexico, 201 3rd Street, N.W., Suite 900, Albuquerque, New Mexico 87103. At the time of payment, Defendant shall send a copy of the EFT authorization and the EFT transaction record, together with a transmittal letter, which shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in U.S. v. El Paso Natural Gas, and shall reference the civil action number of this case and the DOJ case number 90-5-1-1-08184 to the United States in accordance with Section XXII of this Decree (Notices).

10. Defendant shall not deduct the civil penalty paid under this Section in calculating its federal income tax.

VI. GENERAL COMPLIANCE REQUIREMENTS

11. Defendant shall comply with the Federal Pipeline Safety Laws with respect to its Natural Gas Pipeline System. The

Parties agree to discuss any significant changes in the Federal Pipeline Safety Laws that may require modification of this Consent Decree pursuant to Section XXV.

VII. MODIFICATIONS TO PIPELINE SYSTEM

12. Defendant has undertaken an extensive modification to its Natural Gas Pipeline System to Make Piggable certain segments of its pipeline system. As of June 30, 2007, Defendant has completed Make Piggable work on approximately 78% of its pipeline system.

13. Defendant shall accelerate and complete the Make Piggable work no later than December 31, 2010, according to the schedule below:

| **Make Piggable Completion Dates** | **Percentage of Completion of Make Piggable Work** |
|---|---|
| No later than 12/31/07 | 79% |
| No later than 12/31/08 | 88% |
| No later than 12/31/09 | 98% |
| No later than 12/31/10 | 100% |

When Defendant completes its Make Piggable work under this Decree approximately 9,300 of the roughly 10,000 miles in Defendant's Natural Gas Pipeline System will accommodate the use of in-line inspection tools. Defendant may submit a request in writing to the Director of the Southwest Region Office of

Pipeline Safety for a change of any deadline or the cumulative percentage amounts established pursuant to the schedule above in this paragraph, which the Southwest Region Director may grant in writing if he or she determines that good faith efforts to comply with the schedule have been met and good cause for the change to the schedule exists. The granting of such an extension pursuant to this Paragraph shall be within the sole discretion of the Office of Pipeline Safety, and shall not be deemed a material modification within the meaning of Section XXV (Modification) of this Consent Decree. However, any modification to the schedule that allows any pipeline to be modified beyond December 31, 2010 shall be considered a major modification of the Consent Decree.

14. Removal of Drips. Pipeline drips on Defendant's Natural Gas Pipeline System are traditionally pipe-type vessels located below pipeline level and designed to collect liquids from the pipeline. Defendant has removed and shall continue to remove the pipeline drips that are not effective in capturing liquids from the gas stream. Defendant will remove the drips listed below in accordance with the following schedule:

| DIVISION | AREA | PIPELINE | Mile Post and Station Number | Date to Complete Removal |
|---|---|---|---|---|
| Midland | Amarillo | 1114 | 0 + 0090 | 12/31/2009 |
| Midland | Amarillo | 1114 | 30 + 5244.1 | 12/31/2009 |

| | | | | |
|---|---|---|---|---|
| Midland | Amarillo | 1132 | 0 + 0090 | 12/31/2009 |
| Midland | Amarillo | 1132 | 17 + 0344 | 12/31/2009 |
| Tucson | Deming | 2087 | 4 + 5144 | 12/31/2010 |
| Tucson | Tucson | 2111 | 13 + 4255.4 | 12/31/2008 |
| Tucson | Tucson | 2003 | 240 + 2242 | 12/31/2009 |
| Tucson | Tucson | 2003 | 243 + 0985 | 12/31/2009 |

## VIII. GAS QUALITY MONITORING

15. Defendant has enhanced its Gas Quality Database to calculate water vapor dewpoint temperatures on a daily basis and compare against flowing gas temperatures at all receipt meter stations equipped with on-line gas quality equipment. By signing this Consent Decree, Defendant certifies that this enhancement has been completed, and is now integrated into Defendant's standard operating procedure, and documented in Defendant's Gas Quality Guidelines.

16. Defendant shall comply with the Defendant's Operating Procedure for Enforcement of Gas Quality Specifications for El Paso Natural Gas Pipeline ("Operating Procedure for Enforcement"), which is part of its Gas Quality Guidelines, requiring EPNG to monitor potentially corrosive gas quality constituents present in the gas stream, such as hydrogen sulfide, carbon dioxide, water vapor and oxygen. The Operating Procedure for Enforcement is attached hereto as Appendix A.

17. In the semi-annual reports required under Section XV (Reporting Requirements) of this Decree, Defendant shall report and certify its compliance with its Operating Procedure for Enforcement. The reporting shall also include a description of the circumstances where "short term excursions" were granted as that term is defined and used in the Operating Procedure for Enforcement.

## IX. CHEMICAL ANALYSIS OF SAMPLES

18. Defendant shall collect a liquid sample for purposes of chemical analysis whenever a pipeline, vessel, pig trap, meter tube or tank is opened, and a sufficient sample is available. Defendant shall conduct chemical analyses of the sample collected, including both onsite testing and laboratory analyses as permitted by the amounts of liquid available to be collected.

19. If any liquid is present, Defendant will use the capture method to collect the liquid present and shall conduct an initial field test using in water finding paper, water finding paste, or humidity indicating paper to determine if the sample contains the presence of free water (the "Initial Field Test"). If the presence of free water is found, and the free water exists in a quantity of at least 100 milliliters, then Defendant will

perform the following tests: pH, temperature, dissolved hydrogen sulfide, and alkalinity and bacteria to determine the corrosivity of the water. If the presence of free water is found, but with less than 100 milliliters of sample, the sample will be sent to the laboratory for the types of testing permitted by the quantities collected.

20. To the extent that an additional 250 milliliters is collected through the capture methodology, Defendant shall conduct laboratory analysis of each sample collected pursuant to Paragraph 18 to determine its probable composition. The laboratory analysis for purposes of internal corrosion shall include: an analysis of the concentration of anions, metals, glycol, and alkalinity.

21. The results of the Initial Field Test and the results of the chemical analyses from the onsite testing and laboratory analyses shall be documented in the Defendant's Technical Services Information Management System ("TSIMS") database.

22. In the semi-annual reports required under Section XV (Reporting Requirements) of this Decree, Defendant shall certify that the sampling and analysis has been conducted as

required by this Section and that the sampling results were documented as required above in Paragraph 21.

X. MODIFICATIONS TO SITE SPECIFIC PLANS

23. EPNG has divided its operations of the Natural Gas Pipeline System into Operating Areas (referred to as "Area" or "Operating Area" herein), which are depicted on three maps attached hereto as Appendix B. For each Operating Area EPNG has a Site Specific Plan, and Defendant shall conduct an annual review of each Site Specific Plan for each of its Operating Areas. Each review of the Site Specific Plan shall be completed within a calendar year but no later than fifteen months since the last review for each specific Area.

24. Defendant shall review and consider all of the information listed in the Area Site Specific Plan Review Guidelines, attached to this Decree as Appendix C, during the annual Area Site Specific Plan review.

25. Defendant shall modify the Site Specific Plan as appropriate after review of the information specified in Appendix C. Changes to the Area Site Specific Plan may include, but are not limited to the following: future inspection schedules, maintenance pigging frequencies, non-destructive evaluation (NDE)

locations, NDE frequencies, drip blowing frequencies, and corrosion monitoring.

26. Defendant shall document the changes, if any, made to each Site Specific Plan, and the reason for any change made to the Site Specific Plan. The changes will be documented directly in the Site Specific Plan for each Operating Area and each Operating Area's Site Specific Plan shall be kept in the specific Operating Area's offices or shall be accessible on-line to Defendant's Technicians. An additional hard copy shall be kept at the offices of El Paso Western Pipelines located at 2 North Nevada, Colorado Springs, Colorado 80903. Once any changes to the Site Specific Plan have been made, Defendant shall implement the changes or modifications as documented in each Site Specific Plan.

27. Defendant shall certify in the semi-annual reports prepared pursuant to Section XV (Reporting Requirements) that the information listed in Appendix C was reviewed and considered for each Operating Area Site Specific Plan. Defendant shall also certify in the semi-annual reports (i) any changes, (ii) the reason for those changes, (iii) that each change made to each Operating Area Site Specific Plan was documented in each Operating Area's Site Specific Plan within forty-five (45) days of the

changes being made, and (iv) that Defendant is implementing changes as detailed in each Site Specific Plan.

## XI. NON-DESTRUCTIVE EVALUATIONS (NDE) and OTHER REVIEWS and INSPECTIONS

28. Defendant revised its non-destructive evaluation ("NDE") procedures to clarify procedures the process technicians must follow to map accurately the extent and profile of any wall loss, and assist employees in determining what is an acceptable wall loss to continue operating the pipeline system without any changes or modifications. These revisions have been incorporated and documented in Section 305 of the Defendant's NDE Manual ("Section 305"), attached as Appendix D to this Decree.

29. Defendant shall implement the requirements of Section 305. Defendant shall certify in the Semi-Annual reports required pursuant to Section XV (Reporting Requirements) that it has implemented the requirements of Section 305 in its operations.

30. Defendant shall certify in the first report required pursuant to Section XV (Reporting Requirements) that Defendant's NDE technicians have been trained regarding the NDE procedure in its entirety with emphasis placed on the following topics: outlining the responsibilities and accountabilities of the NDE technicians; outlining protocols when utilizing contractors to complete inspections; reviewing the inspection/documentation

reporting structure and document retention requirements; and reviewing the component specific reports.

31. NDE Records Audit and Reinspection. Defendant will collect and review all the NDE records from its implementation of the fifteen (15) Site Specific Plans no later than March 31, 2008. After review of the records, Defendant will develop a proposed NDE Reinspection Plan no later than June 30, 2008 to re-inspect those facilities that are determined to require NDE inspections. The purpose of the review and the NDE Reinspection Plan is to review documentation of NDE inspections performed in the past, evaluate the detail, accuracy and breadth of the documentation, and based on that evaluation determine if facilities that were inspected by NDE need to be re-inspected to ensure it was done correctly and/or documented accurately to reflect the inspection performed.

32. Defendant shall submit the proposed NDE Reinspection Plan to Approved Contractor for review and comment prior to sending to DOT. Approved Contractor shall provide comments to Defendant on NDE Reinspection Plan within a reasonable time frame agreed upon by Approved Contractor and Defendant. Defendant shall incorporate any comments provided by Approved Contractor into revised NDE Reinspection Plan, or explain in writing why the comments are not being implemented into the NDE

Reinspection Plan to DOT. Defendant shall submit the NDE Reinspection Plan and an explanation of Approved Contractor comments to DOT no later than October 31, 2008.

33. The NDE Reinspection Plan submitted shall include an implementation schedule for conducting the required inspections at each facility within the Site Specific Plans. The schedule for the "NDE Reinspection Plan" may be implemented on a rolling schedule, but Defendant shall conduct all necessary inspections to complete a minimum of seven Operating Areas by the end of 2009; and the inspections at the remaining Operating Areas shall be completed by the end of 2010. All inspections required under the NDE Reinspection Plan shall be completed no later than December 31, 2010.

34. Six Area Plan Review. In addition to the requirements of Section X (Modifications to Site Specific Plans), Defendant shall review the Site Specific Plans for the following EPNG Operating Areas: Amarillo, Odessa, Plains, Roswell, Carlsbad and San Juan (the "Six Area Plan Review"). The purpose of the Six Area Plan Review is to ensure that any pipe or other equipment that is most likely to trap liquids on the pipeline system has been inspected, particularly in difficult to access areas. The review will require EPNG to review drawings, receive input from

operations personnel, conduct site visits, and evaluate all of the new information collected during the review. The Six Area Plan Review, and implementation of any necessary inspections in the six Operating Areas being reviewed will be completed no later than December 31, 2010. Defendant shall complete the Six Area Plan Review according to the following schedule:

| OPERATING AREA | DATE FOR REVIEW TO BE COMPLETED | DATE FOR REPORT SUMMARIZING REVIEW SUBMITTED TO DOT |
|---|---|---|
| Carlsbad | January 1, 2008 | March 31, 2008 |
| Amarillo | June 15, 2008 | September 30, 2008 |
| Plains | December 31, 2008 | March 31, 2009 |
| Odessa | August 1, 2009 | November 1, 2009 |
| Roswell | January 15, 2010 | April 30, 2010 |
| San Juan | June 15, 2010 | September 30, 2010 |

35. Pursuant to the Six Area Plan Review described in the above Paragraph, Defendant shall determine whether any pipe or

other equipment is most likely to trap liquids, and has not been inspected to date, and report such findings to Approved Contractor and DOT. Defendant's findings shall include each pipe or piece of equipment found to be likely to trap liquids and include the schedule that the pipe or equipment will be inspected, or provide the engineering reason why such pipe or equipment does not need to be inspected.

36. Defendant shall report its findings pursuant to Paragraphs 34 and 35 in a separate report for each of the Operating Areas listed in Paragraph 34. The report for each of the six Operating Areas shall be submitted to Approved Contractor prior to sending to DOT. The Approved Contractor shall provide comments to Defendant on each Report within a reasonable time frame agreed to by Approved Contractor and Defendant. Defendant shall incorporate comments provided by Approved Contractor or explain in writing to DOT why such comments were not being implemented. The report for each of the six Site Specific Operating Areas, and an explanation of Approved Contractor's comments, shall be submitted to DOT according to the schedule set forth above in Paragraph 34.

37. Defendant shall conduct the inspections according to the schedules contained in Paragraph 34.

38. Modification of § 306 Manual. Defendant's Pipeline Operations Procedure Manual ("POP Manual") provides direction and guidance to Defendant's personnel regarding the means and methods to be utilized to accomplish pipeline maintenance and repair tasks including certain tasks set forth in Defendant's Operating and Maintenance Manual. By signing this Consent Decree, Defendant certifies it has revised and is following Section 306 of the POP Manual concerning In-Line Inspection and Data Analysis to require identification of areas in which data from in-line inspections show internal wall loss features concentrated around the six o'clock (6:00) position in the pipeline.

39. Review of MFL Data. Defendant shall review all high resolution magnetic flux leakage (MFL) data to determine where internal wall loss is concentrated near the bottom of the pipe.

40. After review of the MFL data, Defendant will develop a proposed plan, referred to herein as the "MFL Plan," by monitoring selected features on the pipeline segments to verify over time whether there is any active wall loss, and if so, the rate of the wall loss. The MFL Plan shall include a schedule in which the monitoring will be undertaken.

41. Defendant shall submit the MFL Plan to Approved Contractor for its review and comments prior to sending it to DOT. Approved Contractor shall provide comments to Defendant on the MFL Plan within a reasonable time frame agreed to by Approved Contractor and Defendant. Defendant shall incorporate comments provided by Approved Contractor or explain in writing to DOT why such comments were not adopted. The MFL Plan and explanation of Approved Contractor comments shall be submitted to DOT no later than November 30, 2007.

42. Defendant shall implement the MFL Plan according to the schedule agreed to by the Parties. Any data collected pursuant to the monitoring undertaken by Defendant in accordance with the MFL Plan, including but not limited to any wall loss rate observed and the determinations of whether such wall loss is active or inactive, shall be considered in determining in-line inspection reassessment intervals, as required by the Area Site Specific Plan Review Guidelines (attached hereto as Appendix C).

43. Low Resolution ILI Data. EPNG shall not schedule any reassessment intervals for in-line inspections of pipelines longer than ten (10) years based upon low resolution in-line inspection data with the sole exception of Line 1300 (Roswell to Lincoln). EPNG shall conduct in-line inspection of the following

natural gas pipelines that were previously assessed using low resolution in-line inspection tools according to the following schedule:

| LINE | SEGMENT DESCRIPTION | DATE BY WHICH NEXT IN-LINE INSPECTION MUST BE COMPLETED |
|---|---|---|
| 1300 | Roswell to Lincoln | 12/31/2008 |
| 1100 | Guadalupe to Cornudas | 12/31/2008 |
| 1103 | Guadalupe to Cornudas | 12/31/2008 |
| 3133 | Sweetie Peck to Goldsmith | 12/31/2010 |
| 1212 | Blanco to Valve No. 1 | 12/31/2010 |
| 1212 | Valve 3 ½ to Gallup | 12/31/2010 |

XII. TRAINING REGARDING INTERNAL CORROSION

44. At least annually, Defendant shall review its Corrosion Control Program and based upon its review, will amend the Corrosion Control Program to incorporate advances in technology adopted by Defendant as part of its Corrosion Control Program and changes in Defendant's pipeline operations relevant to corrosion control. Defendant will also train, at least annually its Corrosion Control Specialists and/or Corrosion Engineers on any modifications made to Corrosion Control Program as a result of the review. Defendant shall certify annually, through the

reporting requirements of Section XV, that the review of its Corrosion Control Program and any training resulting from any modifications made to the Corrosion Control Program has been completed.

45. Defendant shall within sixty (60) days of lodging develop a training program concerning interpretation of laboratory analysis results for liquid and solid samples for Defendant's employees that are responsible for evaluating and interpreting laboratory data. The training program must accomplish the basic objective of identifying potentially corrosive indicators through interpretation of laboratory analysis of both solid and liquid samples.

46. Defendant shall train all of Defendant's Corrosion Control Specialists and/or Corrosion Engineers in the above-referenced Liquid and Solid Sampling training program no later than March 31, 2008. Any new employees or employees transferred to be Corrosion Specialists or Corrosion Engineers for Defendant shall receive this training within ninety (90) days of assuming the responsibilities of the Corrosion Specialist or Corrosion Engineer.

## XIII. REVISIONS TO DEFENDANT'S OPERATION AND MAINTENANCE MANUAL

47. By signing this Consent Decree, Defendant certifies that it has incorporated Section 600 of the Defendant's Corrosion Control Manual ("Section 600") into its Operation and Maintenance Manual by reference. Such incorporation requires Defendant to follow the procedures as required in Section 600 consistent with 49 C.F.R. § 192.605.

48. Within sixty (60) days of lodging the Consent Decree, Defendant shall modify its general procedures section (Section 200) of its Corrosion Control Manual to incorporate the Liquid Sampling and Analysis Procedure, attached to this Decree as Appendix E.

49. Any other changes necessitated to Section 600 by the findings made pursuant to Sections X and XI, must be incorporated into Section 600 within ninety (90) days of the particular finding. Any changes made to Section 600 should be explained in the semi-annual reports required under Section XV (Reporting Requirements) of this Decree.

## XIV. APPROVAL OF DELIVERABLES

50. After review of any plan, report, or other item that is required to be submitted pursuant to this Consent Decree, DOT shall in writing: (a) approve the submission; (b) approve the

submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

51. If the submission is approved pursuant to Paragraph 50(a), Defendant shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or approved only in part, pursuant to Paragraph 50(b) or 50(c), Defendant shall, upon written direction from DOT, take all actions required by the approved plan, report, or other item that DOT determines are technically severable from any disapproved portions, subject to Defendant's right to dispute only the specified conditions or the disapproved portions, under Section XVIII of this Decree (Dispute Resolution).

52. If the submission is disapproved in whole or in part pursuant to Paragraph 50(c) or (d), Defendant shall, within forty-five (45) days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. If the resubmission is

approved in whole or in part, Defendant shall proceed in accordance with the preceding Paragraph.

53. Any stipulated penalties applicable to the original submission, as provided in Section XVI of this Decree, shall accrue during the forty-five (45) day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant's obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

54. If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, DOT may again require Defendant to correct any deficiencies, in accordance with the preceding Paragraphs, subject to Defendant's right to invoke Dispute Resolution and the right of DOT to seek stipulated penalties as provided in the preceding Paragraphs.

55. If Defendant has not received any approval, partial approval, disapproval or comments from DOT to a plan, report, or other item or deliverable submitted by Defendant pursuant to this Decree within forty-five (45) days of confirming DOT has received the plan, report or other item or deliverable, Defendant may

proceed in implementing that plan, report or other item or deliverable. However, nothing in this Paragraph shall prevent DOT from discussing any concern it may have with any plan, report, or other item or deliverable submitted by Defendant at any time during the effectiveness of this Decree, and Defendant shall make reasonable efforts to address any concern raised by DOT to a plan, report or other item or deliverable submitted pursuant to this Decree.

## XV. REPORTING REQUIREMENTS

56. Defendant shall submit to the United States semi-annual reports until termination of this Decree. The first semi-annual report is due no later than January 30, 2008, and each semi-annual report shall be submitted every six months thereafter until termination of this Decree pursuant to Section XVI.

57. The semi-annual reports submitted by Defendant shall include a summary of the actions taken to comply with this Consent Decree, including but not limited to the following information:

(a) report and certify regarding the requirement that Defendant comply with the Defendant's Operating Procedure for Enforcement as required by Paragraph 17 of this Decree;

(b) report and certify regarding compliance with the sampling and analysis requirements set forth in Paragraphs 18-22 in Section IX of this Decree;

(c) report and certify regarding the requirements that the Site Specific Plans be reviewed, that changes made to the Site Specific Plans and the reasons for those changes have been documented in the Site Specific Plans, and that changes made to the Site Specific Plans are being implemented as required by Paragraphs 23-27 in Section X of this Decree;

(d) report and certify regarding the requirement that Section 305 of Defendant's NDE Manual has been implemented as required by Paragraph 29 of this Decree;

(e) report and certify regarding the requirements that the internal corrosion tasks be reviewed annually and that any training, if necessary, has been conducted, as required by Paragraph 44 of this Decree; and

(f) report and certify regarding the requirement that changes to Section 600 of Defendant's Corrosion Control Manual be implemented as required by Paragraph 49 of this Decree.

58. If Defendant violates, or has reason to believe that it may violate, any requirement of this Consent Decree, Defendant shall notify the United States of such violation or

potential violation and its likely duration, in writing, within ten (10) working days of the day Defendant first becomes aware of the violation or potential violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully explained at the time the report is due, Defendant shall so state in the report. Defendant shall investigate the cause of the violation and shall then submit an amendment to the report, including a full explanation of the cause of the violation, within thirty (30) days of the day Defendant becomes aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves Defendant of its obligation to provide the notice required by Section XVII of this Consent Decree (Force Majeure).

59. Whenever any violation of this Consent Decree or any other event affecting Defendant's performance under this Decree, may pose an immediate threat to the public health or welfare or the environment, Defendant shall notify the Department of Transportation orally or by electronic or facsimile transmission as soon as possible, but no later than 24 hours after Defendant first knew of, or should have known of, the violation or

event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

60. All reports shall be submitted to the persons designated in Section XXII of this Consent Decree (Notices).

61. Each report submitted by Defendant under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and present the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for the information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fines and imprisonment for violations.

This certification requirement does not apply to emergency or similar notifications where compliance would be impracticable.

62. The reporting requirements of this Consent Decree do not relieve Defendant of any reporting obligations required by the Federal Pipeline Safety Laws, or by any other federal, state, or local law, regulation, permit, or other requirement.

63. Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## XVI. STIPULATED PENALTIES

64. Defendant shall be liable to pay to the United States, automatically and without notice of demand, Stipulated Penalties for violations of this Consent Decree as specified below, unless excused under Section XVII (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan, schedule or other deliverable, Defendant is required to submit under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

65. Late Payment of Civil Penalty. If Defendant fails to pay the civil penalty required to be paid under Section V of this Decree (Civil Penalty) when due, Defendant shall pay a stipulated penalty of $5,000.00 per day for each day that the payment is late. Late payment of the civil penalty shall be made in accordance with Section V, Paragraph 9, above.

66. Compliance Milestones

a. The following Stipulated Penalties shall accrue per violation per day for each violation of the requirements identified in Subparagraph b. below:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $500 per day or portion thereof | 1st through 14th day |
| $1,500 per day or portion thereof | 15th through 30th day |
| $2,500 per day or portion thereof | 31st day and beyond |

b. Failure to comply with the requirements in this Consent Decree other than the reporting requirements specified in Paragraph 67 below. These requirements include but are not limited to the following obligations under this Decree:

(1) Failing to Make Piggable Defendant's Natural Gas Pipeline System according to the schedule and requirements described in Paragraph 13 or remove the drips according to requirements of Paragraph 14;

(2) Failing to review Site Specific Plans, and modify such plans, if necessary, according to requirements of Section X;

(3) Failing to conduct the audit of NDE records according to the requirements of Paragraphs 31-33;

(4) Failing to develop and implement NDE Reinspection Plan according to requirements of Paragraphs 31-33;

(5) Failing to implement inspections required under the NDE Reinspection Plan as set forth in Paragraph 33;

(6) Failing to conduct the Six Area Plan Review according to the requirements of Paragraph 34;

(7) Failing to report and implement the findings of the Six Area Plan Review according to requirements of Paragraph 34-37;

(8) Failing to review high resolution MFL data according to requirements of Paragraph 39;

(9) Failing to develop the proposed MFL Plan according to requirements of Paragraphs 40-41;

(10) Failing to implement MFL Plan according to schedule agreed to by the Parties in Final MFL Plan as required by Paragraph 42;

(11) Failing to conduct in-line inspection of pipeline segments according to schedule set forth in Paragraph 43;

(12) Failing to revise the Defendant's Corrosion Manual according to requirements of Paragraphs 48-49;

(13) Failing to develop internal corrosion training program as required by Paragraph 45; and

(14) Failing to conduct internal corrosion training as required by Paragraphs 44 and 46.

67. Reporting Requirements. The following Stipulated Penalties shall accrue per violation per day for each violation of the reporting requirements of Section XV of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $250 | 1st through 14th day |
| $500 | 15th through 30th day |
| $1,500 | 31st day and beyond |

68. Stipulated Penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated Penalties shall accrue simultaneously for separate violations of this Consent Decree.

69. Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, in writing reduce or waive payment of any portion of the Stipulated Penalties otherwise due it under this Consent Decree.

70. Stipulated Penalties shall continue to accrue as provided in Paragraph 68, above, during any Dispute Resolution, but need not be paid until the following:

a. If the dispute is resolved by agreement or by a decision of DOT that is not appealed to the Court, Defendant shall

pay accrued penalties determined to be owing, together with interest, to the United States within thirty (30) days of the effective date of the agreement or the receipt of DOT's decision or order.

b. If the dispute is appealed to the Court and the United States prevails in whole, or in part, Defendant shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

c. If any Party appeals the District Court's decision, Defendant shall pay all accrued penalties determined to be owing, together with interest, within fifteen (15) days of receiving the final appellate court decision.

71. Obligations Prior to Effective Date. Obligations of Defendant under this Consent Decree to perform duties in Sections V (Penalty), Sections VI through XIII, and Section XV (Reporting Requirements) scheduled to occur prior to the Effective Date, shall be legally enforceable on or after the Effective Date.

72. Defendant shall pay Stipulated Penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 9, above, except that

the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

73. If Defendant fails to pay Stipulated Penalties according to the terms of this Consent Decree, Defendant shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for Defendant's failure to pay any stipulated penalties.

74. Subject to the provisions of Section XX of this Consent Decree (Effect of Settlement/Reservation of Rights), the Stipulated Penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States for Defendant's violation of this Consent Decree or applicable law. Where a violation of this Consent Decree is also a violation of the Federal Pipeline Safety Laws and its implementing regulations, Defendant shall be allowed a credit, for any Stipulated Penalties paid, against any statutory penalties imposed for such violation.

XVII. FORCE MAJEURE

75. "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or of Defendant's contractors, that delays the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation. "Best efforts" includes anticipating any potential force majeure event and addressing the effects of any such event (a) as it is occurring and (b) after it has occurred, to prevent or minimize any resulting delay to the greatest extent possible. "Force Majeure" does not include Defendant's financial inability to perform any obligation under this Consent Decree.

76. Defendant shall provide notice orally or by electronic or facsimile transmission as soon as possible, but not later than 72 hours after the time Defendant first knew of, or by the exercise of due diligence, should have known of, a claimed force majeure event. Within seven (7) days thereafter, Defendant shall also provide written notice, as provided in Section XXII of this Consent Decree (Notices). The notice shall state the anticipated duration of any delay; its cause(s); Defendant's past and proposed actions to prevent or minimize any delay; a schedule

for carrying out those actions; and Defendant's rationale for attributing any delay to a force majeure event. Failure to provide oral and written notice as required by this Paragraph shall preclude Defendant from asserting any claim of force majeure.

77. If the United States agrees that the delay or anticipated delay is due to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by the United States for such time as is necessary to complete those obligations. An extension of time to perform the obligations affected by a force majeure event shall not, by itself, extend the time to perform any other obligation.

78. If the United States does not agree that a force majeure event has occurred, or does not agree to the extension of time sought by Defendant, the United States' position shall be binding, unless Defendant invokes Dispute Resolution under Section XVIII of this Consent Decree. In any such dispute, Defendant bears the burden of proving, by a preponderance of the evidence, that each claimed force majeure event is a force majeure event, that Defendant gave the notice required by Paragraph 76, that the force majeure event caused any delay Defendant claims was

attributable to that event, and that Defendant exercised best efforts to prevent or minimize any delay caused by the event.

XVIII. DISPUTE RESOLUTION

79. Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendant's failure to seek resolution of a dispute under this Section shall preclude Defendant from raising any such issue as a defense to an action by the United States to enforce any obligation of Defendant arising under this Decree.

80. Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendant sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed sixty (60) days from the date the dispute arises, unless that period is modified by written agreement. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within forty-five (45) days after the conclusion of the

informal negotiation period, Defendant invokes formal dispute resolution procedures as set forth below (Formal Dispute Resolution).

81. Formal Dispute Resolution. Defendant shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting Defendant's position and any supporting documentation relied upon by Defendant.

82. The United States shall serve its Statement of Position within forty-five (45) days of receipt of Defendant's Statement of Position. The United States' Statement of Position shall include, but may not necessarily be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding on Defendant, unless Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph (Petitions to the Court).

83. Petitions to the Court. Defendant may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XXII of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within thirty (30) days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

84. The United States shall respond to Defendant's motion within forty-five (45) days of receipt of the Motion, unless the parties stipulate otherwise. Defendant may file a reply memorandum, to the extent permitted by the Local Rules.

85. In any dispute brought under Paragraph 83 (Petitions to the Court) above, Defendant shall bear the burden of demonstrating by a preponderance of the evidence that its position complies with this Consent Decree and the Federal Pipeline Safety Laws. The United States reserves the right to argue that its position is reviewable only on the administrative record and must

be upheld unless arbitrary and capricious or otherwise not in accordance with law. For purposes of this Decree, the administrative record shall comprise the Statements of Position exchanged by the Parties pursuant to Paragraph 81(Formal Dispute Resolution), including any documents attached to or incorporated by reference in those statements.

86. Effect on other obligations. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree, unless and until final resolution of the dispute so provides. Stipulated Penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 70, above. If Defendant does not prevail on the disputed issue, Stipulated Penalties shall be assessed and paid as provided in Section XVI (Stipulated Penalties).

## XIX. INFORMATION COLLECTION AND RETENTION

87. The United States and its representatives, including attorneys, contractors, and consultants, shall have the right to inspect Defendant's Natural Gas Pipeline System, at all reasonable times, upon presentation of credentials and after

complying with Defendant's safety requirements for the particular facility being inspected (which may include watching a safety video, being escorted while on the premises, wearing appropriate personal protection equipment such as a hard hat, safety goggles, and/or Nomex fire retardant attire, but shall not include any requirement that the representative sign any liability or waiver release), to:

1. monitor the progress of activities required under this Consent Decree;

2. verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

3. obtain samples and, upon request, splits of any samples taken by Defendant or its representatives, contractors, or consultants when sufficient quantities of the sample permits such splits;

4. obtain documentary evidence, including photographs and similar data; and

5. assess Defendant's compliance with this Consent Decree.

88. Upon request, Defendant shall provide DOT or its authorized representatives splits of any samples taken by

Defendant, provided sufficient quantities of the sample permits a split. Upon request, DOT shall provide Defendant splits of any samples taken by DOT provided sufficient quantities of the sample permits a split.

89. Until five years after the termination of this Consent Decree, Defendant shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relates in any manner to Defendant's performance of its obligations under this Consent Decree. This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the United States, Defendant shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

90. At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant shall notify the United States at least 90 days prior to the destruction of any documents, records, or other information subject to the

requirements of the preceding Paragraph and, upon request by the United States, Defendant shall deliver any such documents, records, or other information to DOT. Defendant may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Defendant asserts such a privilege, it shall provide the following: (1) information sufficient to determine whether the a privilege applies, including at a minimum, the title of the document, record or information, and a description of the type of document, record or information for which the privilege or protective doctrine is claimed; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information and whether the author is an attorney or paralegal; (4) the name and title of each addressee and recipient of the document record or information and whether the recipient is an attorney or paralegal; (5) a general description of the subject of the document, record, or information; and (6) the privilege asserted by Defendant. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree are considered privileged and such documents shall not be withheld on grounds of privilege. This previous sentence does not apply to

documents, records or other information retained pursuant to Paragraph 89, but not created or generated pursuant to the requirements of this Consent Decree.

91. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendant to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

XX. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

92. This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action and resolves the violations alleged in the Notice of Probable Violation, Proposed Civil Penalty and Proposed Compliance order (CPF No, 4-2001-1004) issued June 20, 2001 by the Research and Special Programs Administration (predecessor to PHMSA) of the Department of Transportation, through the date of lodging.

93. The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 95. This Consent

Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Federal Pipeline Safety Laws or its implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 92. The United States further reserves all legal and equitable remedies to address any condition that poses a pipeline integrity risk to public safety, property or the environment or to address any hazard to life, property or the environment arising at, or posed by, Defendant's Natural Gas Pipeline System, whether related to the violations addressed in this Consent Decree or otherwise.

94. This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendant is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that Defendant's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Federal Pipeline

Safety Laws, or with any other provisions of federal, State, or local laws, regulations, or permits.

95. This Consent Decree does not limit or affect the rights of Defendant or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Defendant, except as otherwise provided by law.

96. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

97. Defendant does not admit any of the allegations of the Complaint; and nothing in this Consent Decree shall constitute or be construed as an admission of liability, fact or violation of law or regulation, or of any wrongdoing on the part of Defendant.

## XXI. COSTS

98. The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any Stipulated Penalties due but not paid by Defendant.

## XXII. NOTICES

99. Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed as follows:

To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C. 20044-7611
Re: DOJ No. 90-5-1-1-08184

[Department of Justice]

Director, Southwest Region
Office of Pipeline Safety
Pipeline and Hazardous Materials Safety Administration
8701 South Gessner, Suite 1110
Houston, TX 77074

and

Deputy Chief Counsel
Office of Chief Counsel
Pipeline and Hazardous Material Safety Administration
1200 New Jersey Avenue, SE
Sector E26
Washington, DC 20590

[Department of Transportation]

To Defendant:

Craig V. Richardson
Vice President and General Counsel for the Western Pipelines
2 North Nevada Avenue
P.O. Box 1087

Colorado Springs, CO 80944-1087

100. Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

101. Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

XXIII. EFFECTIVE DATE

102. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter a Consent Decree is granted, whichever occurs first, as recorded in the Court's docket; provided however that Defendant hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective Date. In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

XXIV. RETENTION OF JURISDICTION

103. The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders

modifying this Decree, pursuant to Sections XVIII and XXV, or effectuating or enforcing compliance with the terms of this Decree.

XXV. MODIFICATION

104. The terms of this Consent Decree may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to any term of this Decree, it shall be effective only upon approval by the Court. The terms and schedules contained in Appendices A - E of this Decree may be modified upon written agreement of the Parties without Court approval, unless any such modification effects a material change to the terms of this Consent Decree or materially affects the Defendant's ability to meet the requirements or objectives of this Decree.

105. Any disputes concerning modification of this Decree shall be resolved pursuant to Section XVIII of this decree (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 85, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b). The Parties expressly recognize that in view of the continuing nature of this Decree and the technical

nature of the matters set forth in Sections VII -XIII, there is a possibility that material changes in conditions or circumstances from those known at the time of the entry of this Decree could occur.

## XXVI. TERMINATION

106. After Defendant has maintained continuous satisfactory compliance with the requirements of the Federal Pipeline Safety Laws, and has complied with all obligations of this Consent Decree, and has paid the civil penalty and any accrued Stipulated Penalties as required by this Consent Decree, Defendant may serve upon the United States a Request for Termination, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

107. Following receipt by the United States of Defendant's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States agrees that the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

108. If the United States does not agree that the Decree may be terminated, Defendant may invoke Dispute Resolution under Section XVIII of this Decree. However, Defendant shall not seek Dispute Resolution of any dispute regarding termination, under Paragraph 81 of Section XVIII, until sixty (60) days after service of its Request for Termination.

109. Nothing in this Consent Decree prevents Defendant from completing any of the obligations earlier than the deadlines provided for herein.

110. Paragraphs 40-42 of this Decree requires monitoring selected features on the pipeline segments according to the MFL Plan over a period of time, and this obligation may continue past the other obligations under this Decree. If Defendant has complied with all of its obligations under this Decree as specified in Paragraph 106 with the exception of the requirements of Paragraphs 40-42, Defendant may serve upon the United States a Request for Termination with respect to all of the other obligations it has completed under this Decree with the exception of requirements under Paragraphs 40-42, stating that Defendant has satisfied those requirements, together with all necessary supporting documentation.

111. Following receipt by the United States of Defendant's Request for Termination under Paragraph 110, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendant has satisfactorily complied with the requirements for termination of this Consent Decree. If the United States agrees that the Defendant has complied with all of its obligations under this Decree except for the requirements of Paragraph 42, the United States will send notification to Defendant stating that its obligations under the Consent Decree have been met with the sole exception of Paragraph 42. If the United States does not agree, Defendant may proceed as set forth in Paragraph 108.

XXVII. PUBLIC PARTICIPATION

112. This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. Defendant consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the

Court or to challenge any provision of the Decree unless the United States has notified Defendant in writing that it no longer supports entry of the Decree.

## XXVIII. SIGNATORIES/SERVICE

113. Each undersigned representative of Defendant and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

114. This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

115. Defendant and the United States agree to accept service of process from the each other by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIX. INTEGRATION

116. This Consent Decree and its Appendices constitute the final, complete, and exclusive agreement and understanding

among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than the Appendices, which are attached to and incorporated in this Decree, and deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXX. FINAL JUDGMENT

117. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States and Defendant.

## XXXI. EMERGENCY ACTIONS

118. Nothing in this Consent Decree shall prevent Defendant from acting when Defendant deems it necessary to do so to ensure the health and/or safety of the public, its personnel or the environment, provided that in such an event, Defendant shall provide notice to DOT orally or by electronic or facsimile transmission as soon as possible, but not later than 72 hours after the time Defendant took such emergency action. Within seven (7) days

thereafter, Defendant shall also provide written notice as provided in Section XXII of the Consent Decree (Notices) stating the nature of the emergency and the immediate actions taken to address the emergency. In instances where Defendant acts under this Paragraph, Defendant is still required to comply with all of its obligations under this Decree. DOT reserves the right to review the actions taken under this Paragraph to determine if Defendant is in compliance with this Decree and the Federal Pipeline Safety Laws.

XXXII. APPENDICES

119. The following appendices are attached to and incorporated into this Consent Decree:

"Appendix A" is the Operating Procedure for Enforcement;

"Appendix B" contains three maps depicting EPNG's fifteen Operating Areas;

"Appendix C" is the Area Site Specific Plan Review Guidelines;

"Appendix D" is Section 305 of Defendant's NDE Manual;

"Appendix E" is the Liquid Sampling and Analysis Procedure.

So Ordered this _____ day of , 2007

_______________________________

United States District Judge

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. El Paso Natural Gas Co.*

FOR PLAINTIFF UNITED STATES OF AMERICA:

Dated: 20 July 2007

Ronald J. Tenpas
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Dated: 24 July 2007

Patricia A. McKenna
Senior Attorney
Environmental Enforcement Section
601 D. Street, N.W.
Room 6424
Washington, D.C. 20004

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. El Paso Natural Gas Co.*

Dated: 7-17-2007

Thomas J. Barrett

Thomas J. Barrett
Administrator
Pipeline and Hazardous
Materials Safety Administration
United States Department of Transportation
1200 New Jersey Avenue, SE
Washington, D.C.

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. El Paso Natural Gas Co.*

FOR DEFENDANT EL PASO NATURAL GAS COMPANY:

DATED:

James J. Cleary
President, El Paso Natural Gas Company
2 North Nevada Avenue
Colorado Springs, CO 80903